# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**

    **Plaintiff,**

**v.**                                                         Case No. 06-20183-01-JWL

**CARLOS LOPEZ,**

    **Defendant.**

## MEMORANDUM AND ORDER

The indictment in this case charges the defendant Carlos Lopez with one count of conspiracy to distribute and possess with intent to distribute methamphetamine and one count of possession with intent to distribute methamphetamine. This matter is before the court on Mr. Lopez's motion to suppress (doc. #32) which challenges the validity of a traffic stop conducted by Kansas Highway Patrol troopers on December 11, 2006. Mr. Lopez argues that both the initial stop and the eventual search of his vehicle violated his rights under the Fourth Amendment.

The court held an evidentiary hearing on the motion at which the government presented testimony from three witnesses: Special Agent Dana Suchma, employed by the Drug Enforcement Agency; Trooper Charles Lovewell, employed by Kansas Highway Patrol; and Lieutenant Tom Catania, also employed by Kansas Highway Patrol. After thoroughly considering the parties' arguments and the evidence, the court will grant the motion.

## I.    Findings of Fact

On the morning of December 11, 2006, SA Suchma[1] was performing drug interdiction surveillance at a hotel located in Kansas City, Kansas. Around 9:20 a.m., he noticed a red truck in the parking lot of the hotel with its engine running. He further observed that the truck had Texas plates and that the individual in the driver seat appeared to be smoking a cigarette. After running a check of the license plate, SA Suchma discovered that the truck was registered to Carlos Lopez in Pharr, Texas.[2] SA Suchma then verified with the hotel clerk that a Carlos Lopez had checked in around 11:00 the previous evening, had checked out around 9:00 that morning, and had paid cash for the room.

After further observing the truck for another 40 minutes or so, SA Suchma watched as the red truck exited the hotel and entered the parking lot of a drive-in restaurant located next door.[3] SA Suchma also observed a green truck exit the hotel parking lot, follow the red truck into the drive-in parking lot, and pull into the space directly next to the red truck.[4] No evidence was presented whether or not Mr. Lopez ordered any food. Mr. Lopez exited his vehicle and walked to the front of it. At approximately the same time, the passenger of the green truck

---

[1] SA Suchma has worked with the DEA since 1997. He specializes in drug investigations and has experience conducting drug interdiction activities at hotels and motels.

[2] SA Suchma consulted a map and discovered that Pharr is a suburb of McAllen, Texas, a town located near the border with Mexico.

[3] SA Suchma was accompanied by three other officers conducting surveillance

[4] None of the officers observed the green truck enter the hotel parking lot and no contact between the two vehicles was observed in the hotel parking lot.

2

exited that vehicle holding a white Styrofoam cooler with red handles. The passenger proceeded to place the cooler in the bed of the red truck driven by Mr. Lopez.

Subsequently, Mr. Lopez re-entered the red truck. The passenger from the green truck walked over to Mr. Lopez and engaged in a brief conversation with him. Following that, Mr. Lopez exited the parking lot and proceeded south on I-35. Prior to the brief exchange between the passenger and Mr. Lopez, SA Suchma did not personally observe any contact between Mr. Lopez and any of the individuals riding in the green truck.

Once it was determined that the vehicle was on I-35, SA Suchma contacted the Kansas Highway Patrol and requested a patrol car to assist with a traffic stop of the red truck driven by Mr. Lopez. SA Suchma then relayed the information he had observed to a task force officer with the Kansas Highway Patrol, who put Lieutenant Catania in contact with SA Suchma. SA Suchma told Lieutenant Catania what he had observed at the hotel and restaurant parking lots and asked him to initiate a traffic stop of the vehicle. SA Suchma also gave Lieutenant Catania a description of the vehicle, the license plate number, and Mr. Lopez's information.

Trooper Lovewell[5] was driving and Lieutenant Catania[6] was a passenger in the patrol car when the red truck was located southbound on I-35. The patrol car followed Mr. Lopez's vehicle, which was traveling in the right lane, with the patrol car in the left lane for about three

---

[5]Trooper Lovewell had been a Kansas Highway Patrol trooper for four years at the time of the suppression hearing. Furthermore, he had received specific training in drug interdiction activities.

[6]Lieutenant Catania had been a law enforcement officer for 23 and a half years. He also had extensive training and experience with drug interdiction activities.

3

or four car lengths. Trooper Lovewell testified that the weather conditions were fair, there was no precipitation at the time of the stop, and that the roads were not slick. Trooper Lovewell further indicated that there was no roadway construction, the road Mr. Lopez was traveling on was fairly straight with no significant hills, and there were no other vehicles around Mr. Lopez.

Trooper Lovewell observed the truck weaving and saw the right tires of the truck drift completely over the fog line on the right side of the lane in which it was traveling for a few seconds. At the time Trooper Lovewell observed Mr. Lopez's vehicle drift over the fog line, there was nothing on the right shoulder such as a vehicle, debris, or anything else that Mr. Lopez could have hit or endangered by being partially on the shoulder of the road. After making these observations, Trooper Lovewell activated the patrol car's lights and proceeded to pull over Mr. Lopez. When Trooper Lovewell activated the lights, the video recorder in his car was activated, documenting the stop. The supposed infraction for which Mr. Lopez was stopped, however, was not recorded.

Trooper Lovewell made initial contact with the vehicle by approaching it from the passenger's side window and motioning for Mr. Lopez to roll down the window. Mr. Lopez leaned over and opened the passenger door. After telling Mr. Lopez that he was stopped for weaving in his lane and drifting across the fog line, Trooper Lovewell asked for his driver's license and proof of insurance. Mr. Lopez produced the requested items.[7]

---

[7]Trooper Lovewell testified that during his initial encounter with Mr. Lopez, he observed that there were coffee cups, wrappers, and fruit laying on the floor of the truck. He also observed a large suitcase on the back seat and a tool box on the floor.

At this time, Trooper Lovewell also inquired about Mr. Lopez's travel plans.[8] According to Trooper Lovewell, Mr. Lopez initially indicated that he was traveling from Florida to Dallas, Texas. Trooper Lovewell questioned why Mr. Lopez was in Kansas City if his route was from Florida to Texas, to which Mr. Lopez responded that he had gone from Florida to Dallas and then from Dallas to Kansas City and was returning to Dallas. Trooper Lovewell asked Mr. Lopez why he was in Kansas City; in response, Mr. Lopez told Trooper Lovewell that he was moving from Florida to Texas and was purchasing a house, and that he came to Kansas City to sign the papers. Trooper Lovewell asked why he had to drive all the way up to Kansas City to do that rather than having the papers faxed or mailed to him, to which Mr. Lopez simply responded that he had to drive to Kansas City. Trooper Lovewell testified at the hearing that this story did not seem logical to him. Lieutenant Catania also testified that this story seemed unbelievable to him.

During this exchange between Trooper Lovewell and Mr. Lopez regarding the travel plans, Lieutenant Catania had radioed Mr. Lopez's driver's license information to dispatch. When the two officers returned to the patrol car, dispatch requested Mr. Lopez's country of birth and social security number, which Lieutenant Catania went to retrieve while Trooper Lovewell remained in the patrol car. Lieutenant Catania obtained a social security card from Mr. Lopez

---

[8]During this portion of the video tape, the audio portion is unclear. Additionally, although at times Trooper Lovewell and Lieutenant Catania can be heard and understood, throughout the tape it is difficult to hear and understand Mr. Lopez's responses.

5

and found out that he was born in Cuba.[9] Trooper Lovewell and Lieutenant Catania also learned that the vehicle had been purchased in August of 2006 and had accumulated 14,000 miles at the time of the stop in December. Both officers indicated at the hearing that to accumulate this amount of mileage in about three or four months seemed excessive to them. Trooper Lovewell testified that many drug couriers travel long distances in a short amount of time to increase the number of loads they take and to reduce the risk of getting caught; thus, the high mileage was suspicious to him. Lieutenant Catania similarly found the high mileage suspicious, particularly in light of that fact that, according to him, Mr. Lopez had told the troopers that he was a truck driver who drove five days a week; Lieutenant Catania testified that by his calculation, that would only amount to about 30 or 40 days that Mr. Lopez would be driving his personal car.

Trooper Lovewell issued Mr. Lopez a warning for failing to maintain a lane and explained that it was just a warning and returned Mr. Lopez's driver's license and social security card. Trooper Lovewell testified at the hearing that he told Mr. Lopez he was "free to go." However, the video tape of the stop indicates that Trooper Lovewell never said those exact words, but rather told him "have a safe trip" and "be safe."

Trooper Lovewell then turned away from the vehicle momentarily before returning to it and knocking on the passenger window again.[10] Mr. Lopez made a motion for him to open the door. Trooper Lovewell opened the door and asked Mr. Lopez if he could ask him a couple

---

[9]Mr. Lopez had some difficulty understanding Lieutenant Catania's questions regarding where he was born, but was eventually able to understand the question.

[10]At this point, Trooper Lovewell testified that he noticed Mr. Lopez had his hand on the gearshift.

6

more questions, to which Mr. Lopez responded "like what?" Trooper Lovewell then repeated the question and Mr. Lopez again responded "like what?" Trooper Lovewell asked him if there was anything illegal in the car, to which he responded "no." Trooper Lovewell then asked whether he was sure there wasn't anything illegal in the car, like drugs, and proceeded to list various drugs such as marijuana, cocaine, and methamphetamine. By this time, Lieutenant Catania was leaning over Trooper Lovewell and asked whether there were any weapons or large amounts of currency in the car. To all of these questions, Mr. Lopez responded "no." During this time, Mr. Lopez never indicated that he did not want to answer the troopers' questions.

Trooper Lovewell then asked Mr. Lopez if he could search the vehicle. Mr. Lopez responded "yes," followed by something Trooper Lovewell did not understand. Trooper Lovewell then asked whether he could search the vehicle and its contents and Mr. Lopez asked him to repeat it slowly. Trooper Lovewell repeated the question a few more times, and Mr. Lopez again said yes followed by words Trooper Lovewell did not understand. Trooper Lovewell asked the question a final time, and Mr. Lopez repeated the question back to him and answered yes.[11] Trooper Lovewell testified that once Mr. Lopez repeated the question back to him and answered yes without saying anything else after that, he was "one hundred percent sure" that Mr. Lopez understood the question and was giving consent to search the vehicle. He further testified that Mr. Lopez's body language was not inconsistent with giving consent.

---

[11]Trooper Lovewell indicated that prior to this conversation regarding the search of the vehicle, he had experienced little difficulty communicating with Mr. Lopez other than having to repeat a word or two.

7

After receiving consent from Mr. Lopez, Trooper Lovewell instructed him to exit the vehicle and Lieutenant Catania escorted him to the rear of the vehicle. Trooper Lovewell began to search and located methamphetamine in the Styrofoam cooler in the bed of the truck shortly thereafter.

**II.  Analysis**

*A.  Initial Stop*

The Fourth Amendment prohibits unreasonable searches and seizures by the Government. U.S. Const. amend. IV. "Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)." *Id*. "The first inquiry under *Terry* is whether the stop was justified at its inception." *Williams*, 403 F.3d at 1206 (citing *United States v. Botera-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)). "The second *Terry* inquiry is whether the officer's conduct during detention was reasonably related in scope to the circumstances which justified the initial stop." *Id*. (citing *Terry*, 392 U.S. at 20).

1.  Traffic Violation

Mr. Lopez first argues that the officers lacked justification to stop him for violating K.S.A. § 8-1522. In order to satisfy the reasonableness requirement of the Fourth Amendment, the traffic stop "'must be based on an observed traffic violation' or a 'reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" *United States v.*

8

*Cline*, 349 F.3d 1276, 1286 (10th Cir. 2004)(quoting *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001))(further citations omitted). "'When evaluating the reasonableness of the initial stop of a vehicle, our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005)(quoting *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003).

In this case, the troopers testified that they stopped Mr. Lopez for violating K.S.A. § 8-1522[12] because they observed him weave within his lane and then cross the white fog line on the right side of the highway once. The Tenth Circuit has previously held that a single instance of crossing the fog line did not constitute a violation of a similar Utah statute where the road was winding, the terrain mountainous and the weather conditions windy. *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996). In subsequent opinions, however, the Circuit has clarified that *Gregory* does not "stand[] for the proposition that a single instance of drifting onto the shoulder can *never* be a violation of a traffic statute like section 8-1522." *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003). Rather, in determining whether a statute such as K.S.A. 8-1522 has been violated, courts must "'analyze objectively all the surrounding facts and circumstances to determine whether' the officer had reasonable suspicion that a violation of the statute had occurred." *Alvarado*, 430 F.3d at 1308 (quoting *United States v. Ozbirn*, 189 F.3d

---

[12]K.S.A. 8-1522 provides: "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." K.S.A. § 8-1522(a).

9

1194, 1198 (10th Cir. 1999)).

In this case, Trooper Lovewell testified that he observed Mr. Lopez's vehicle's tires completely cross over the fog line and he issued him a warning for failure to maintain a lane. The government argues that Trooper Lovewell had reasonable suspicion, based on these observations, that Mr. Lopez had committed a violation of K.S.A. § 8-1522. As defendant notes, however, in an opinion issued after the December 11, 2006 traffic stop, the Kansas Court of Appeals, in reversing the defendant's conviction for violating the statute as well as finding no reasonable suspicion, held that a violation of K.S.A. § 8-1522 only occurs if a vehicle not only moves from its lane of travel, but also leaves its lane when it was not safe to do so. *State v. Ross*, 149 P.3d 876, 880 (Kan.App. 2007). In *Ross*, the defendant crossed the fog line once for a short distance, but there was no evidence that it was unsafe to do so. Thus, the court concluded, "there was no reasonable suspicion that Ross was engaged in the conduct that is at the heart of the statute." *Id*. Put another way, there was no violation of the statute to justify the stop.

The appropriate standard when evaluating a violation of K.S.A. § 8-1522, therefore, is whether the vehicle crossed the fog line when it was not safe to do so.[13] Based on this standard, the facts in this case do not support a reasonable suspicion that Mr. Lopez violated K.S.A. 8-

---

[13]The court must look to the Kansas court's interpretation of the law in this situation. *See United States v. Tibbetts*, 396 F.3d 1132, 1138 (in determining whether officer had reasonable articulable suspicion of violation of Utah traffic statute, Tenth Circuit first looked for any Utah case interpreting the provision, stating that "when evaluating the issue of the reasonableness of the traffic stop under the Fourth Amendment, the district court must determine how the Utah courts would interpret this statute in like circumstances."). Fortunately, in this case, the court need not determine how the Kansas courts would interpret K.S.A. § 8-1522 because the Kansas Appellate Court has already made such a determination.

10

1522. There is no indication in the record that Mr. Lopez crossed over the fog line when it was unsafe to do so. Trooper Lovewell specifically testified that there were no other cars around and there was nothing on the shoulder that Mr. Lopez could have hit or endangered by briefly crossing over the fog line.

Here, Trooper Lovewell was mistaken in his belief that a violation of § 8-1522 occurs when a vehicle crosses the fog line once with no other explanation for such movement; rather, such a violation occurs when a vehicle crosses the fog line when it is not safe to do so. Such a mistake of law cannot support the reasonable suspicion necessary to justify a traffic stop. *United States. v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005). The Tenth Circuit has distinguished between mistakes of law and mistakes of fact:

> We have consistently held that an officer's mistake of fact, as distinguished from a mistake of law, may support probable cause or reasonable suspicion necessary to justify a traffic stop. *United States v. DeGasso*, 369 F.3d at 1144; *see also United States v. Salinas-Cano*, 959 F.2d 861, 865 (10th Cir. 1992). But we have also held that failure to understand the law by the very person charged with enforcing it is not objectively reasonable. *See DeGasso*, 369 F.3d at 1144.

*Id*.

Furthermore, even if Trooper Lovewell's mistake of law was made in "good faith," such a mistake cannot provide an "objectively reasonable" basis for stopping Mr. Lopez. *See United States v. Degasso*, 369 F.3d 1139, 1144 (10th Cir. 2004). *See also*, *United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003)( holding that, even though the officer's

11

mistake of law was reasonable, "a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop."); *United States v. King*, 244 F.3d 736, 741-42 (9th Cir. 2001)("Although [the officer] acted reasonably and his interpretation of the traffic law was reasonable, he was nonetheless mistaken in his belief that [the defendant's] conduct violated the law. Because an officer's mistake of law cannot form the basis for reasonable suspicion to initiate a traffic stop, we reverse the district court's denial of [the defendant's] motion to suppress."). Because Trooper Lovewell made a mistake of law in stopping Mr. Lopez for a violation of K.S.A. § 8-1522, the stop was not supported by reasonable suspicion on that basis.[14]

2.   Reasonable Suspicion

Even if the stop was not validly premised on a traffic violation, the court's inquiry does not end because the government alternatively argues that the stop was justified because the officers had reasonable suspicion, independent of the traffic violation, of criminal activity. "[A]n initial traffic stop does not run afoul of the Constitution if the officer has 'probable cause, or at least articulable reasonable suspicion, that there has been a criminal violation or that there is evidence of criminal activity in the vehicle.'" *United States v. Crizales-Toledo*, 454 F.3d 1142, 2247 (10th Cir. 2006)(quoting *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006)). *See also United States v. Arvizu*, 534 U.S. 266, 273 (2002)("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'")(citations omitted).

---

[14]The government does not argue that the troopers stopped Mr. Lopez for an alternative suspected traffic violation, such as driving under the influence or reckless driving.

In making a reasonable suspicion determination, the Supreme Court has repeatedly instructed that courts look at the totality of the circumstances of each case to determine "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.'" *Arvizu*, 534 U.S. at 273 (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The court examines the events "leading up to the stop to determine whether historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (quotation omitted).

The court recognizes that the Supreme Court has rejected a "divide-and-conquer" analysis, *Arvizu*, 534 U.S. at 274, and that it may not evaluate and reject each factor in isolation. *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005). Thus, "reasonable suspicion may exist even if 'each observation' is 'susceptible to an innocent explanation." *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007)(quoting *Arvizu*, 534 U.S. at 274).

The Tenth Circuit recently reiterated how courts should apply the totality of the circumstances test when making reasonable suspicion determinations:

> 'Factors, which when taken separately may be perfectly innocent behavior, can support a finding of reasonable suspicion when taken together. Conversely, although the nature of the totality of the circumstances makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation. In analyzing the factors that may amount to reasonable suspicion, we must be careful

to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances.'

*United States v. Ramirez*, 479 F.3d 1229, 1244 (10th Cir. 2007)(quoting *United States v. Wallace*, 429 F.3d 969, 975-76 (10th Cir. 2005)).

At the time they initiated the traffic stop, the troopers in this case knew that: (1) Mr. Lopez was from a Texas town near the border with Mexico, from which illegal drugs are often brought into the United States; (2) he checked into the hotel late at night and checked out fairly early the next morning; (3) he paid cash for the room; (4) he sat in his vehicle in the hotel parking lot with the motor running for some time; (5) he drove next door to a drive-in restaurant where he was joined by another vehicle; (6) a passenger from the other vehicle placed a cooler in the bed of Mr. Lopez's vehicle; and (7) Mr. Lopez exited the parking lot with the cooler in his truck and proceeded south. The court will examine each factor individually, but recognizes that the ultimate issue is whether these factors, "taken as a whole . . . support a finding of reasonable suspicion." *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005).

The fact that Mr. Lopez is from Texas "is, at best, a weak factor in finding suspicion of criminal activity." *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001). "In this Circuit alone, police testimony has identified an extremely broad range of known 'drug source areas.'" *Id.* (collecting cases). Accordingly, the court does not give the first factor much weight in making its reasonable suspicion determination, particularly because the record does not show that, prior to the stop, the troopers had any indication that Mr. Lopez attempted to conceal the

14

fact that he was from Texas. *See id.* (stating that indications that individual is concealing connection with known drug source area can "give rise to suspicion"). *See also United States v. Guerrero*, 472 F.3d 784, 787-88 (10th Cir. 2007)(finding that a defendant's connection to a so-called "drug source" city or state is "so broad as to be indicative of almost nothing").

Similarly, the court finds that Mr. Lopez's paying for the room with cash should not be given much weight. Paying with cash is "wholly consistent with innocent travel." *United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir. 1992), *overruled on other grounds*, *United States v. Little*, 18 F.3d 1499 (10th Cir. 1994). Furthermore, the record does not indicate that the amount paid by Mr. Lopez was an unusually large sum of cash, nor is there any indication that Mr. Lopez attempted to hide his identity from the hotel. *Cf. United States v. Sokolow*, 490 U.S. 1, 2 (1989)(finding reasonable suspicion where, among other things, defendant paid for airline ticket with $2,100 in cash and traveled under an alias).

The court also concludes that the third and fourth factors–that Mr. Lopez checked into the hotel late the previous evening and checked out early in the morning and then waited in the parking lot for some time–are also not entitled to much weight. SA Suchma testified at the hearing that although these factors alone are not necessarily suspicious, taken together they were suspicious to him. Neither SA Suchma nor the troopers, however, articulated any reason at the hearing why these activities would contribute to their suspicions that Mr. Lopez was engaged in drug activity. *See United States v. Stewart-Poppelsdorf*, 120 F.App'x 230, 233 (10th Cir. 2004)(rejecting government's argument that the presence of a radar detector in defendants' car was suspicious where no evidence was providing linking radar detectors to drug trafficking).

15

The remaining factors are that Mr. Lopez drove next door to a drive-in fast food restaurant, met another vehicle there, and received a cooler from one of the occupants of that vehicle. The only testimony offered by the government with respect to the suspiciousness of these activities related to the exchange of the cooler. SA Suchma testified that based on his previous hotel interdiction experience, it was not "uncommon" to find containers exchanged in a public area and that it was not "uncommon" to later find that those containers contained either drugs or large amounts of currency. Lieutenant Catania testified that in his experience involving drug interdiction, he watched for an exchange of some sort, either an exchange of vehicles or an exchange of containers. Thus, according to both witnesses, the exchange of the cooler that occurred in this case made them suspicious.

Other courts have found reasonable suspicion where the officers observed an exchange or transfer of some sort, but those cases involved something more than the facts that are present here. For example, in *United States v. Bustos-Torres*, 396 F.3d 935 (8th Cir. 2005), the Eighth Circuit found reasonable suspicion justifying an investigative stop where there was not only a suspected drug exchange, but it occurred in a high crime area and involved an individual who moments earlier had been observed exchanging a small plastic "baggie" for currency. *Id*. at 943. In *United States v. Crawford*, 2007 WL 1089699 (April 10, 2007 E.D. Ark), the court found reasonable suspicion justifying a traffic stop where the officer recognized the defendant as someone with a criminal history and observed him exchange something with another individual in a high crime area at night. *Id*. at *4. *See also United States v. Williams*, 139 F.3d 628, 630 (8th Cir. 1998)(finding reasonable suspicion justifying stop where officer observed defendant

exchange in area associated with drug trafficking and officer suspected defendant of drug trafficking behavior in the past); *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992)(finding reasonable suspicion justifying *Terry* stop where exchange of money and small object occurred in high narcotic area and involved vehicle matching that given in citizen's complaint).

In *United States v. Harris*, 188 F.App'x 498, 501 (7th Cir. 2006), the Seventh Circuit recognized that an observed exchange can lead to reasonable suspicion where at least the police were able to "articulate what they saw exchanged and possess additional facts beyond the purported transaction supporting the suspicion." *Id.* at 501 (gathering cases). In *Harris*, the officer observed a hand-to-hand exchange between the defendant and another individual in an area known for narcotics activity and the defendant then quickly walked away when approached by the officers and ignored their commands to stop. *Id.* at 500. The court in *Harris* concluded the exchange alone was not suspicious, however, finding that the officer's determination that the exchange involved drugs was "based on no particularized facts and is more akin to the very type of 'hunch' that the Fourth Amendment protects against." *Id.* at 501. The court rejected the government's argument that the exchange was suspicious based on the officer's training and experience because it "failed to suggest what an experienced officer might know that would take this exchange out of the realm of innocent behavior." *Id.* Nevertheless, the court in *Harris* went on to find reasonable suspicion based upon the exchange *coupled with other factors*, such as the high crime area, defendant's hasty exit from the scene, and his failure to adhere to the officers' commands to stop. *Id.* at 501-02.

17

Although it is a close call, the court finds that in this case, even in light of their training and experience, the troopers did not possess the requisite objective, particularized reasonable suspicion to justify stopping Mr. Lopez's vehicle. Completely innocent factors may amount to reasonable suspicion under the totality of the circumstances test; but, "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."*Ramirez*, 479 F.3d at 1244.

In this case, unlike the cases cited above, the factors relied on by the government in addition to the exchange are simply not enough, even when viewed in totality, to support a finding of reasonable suspicion. Even when considering that Mr. Lopez was from Texas, had a brief stay at the hotel, paid in cash and waited in the parking lot, there is nothing articulable to indicate that criminal activity might be afoot. There is nothing in the record, such as presence in a high crime area, known criminal history, or an informant's tip, to take the exchange of the cooler out of the realm of innocent activity. In other words, the court finds no "concrete reasons" supporting an interpretation that the innocent factors in this case amounted to a "suspicious conglomeration." Thus, the court is not satisfied that, at the time the troopers stopped Mr. Lopez, they had developed a reasonable suspicion rather than mere "inchoate suspicions and unparticularized hunches" to link the cooler or Mr. Lopez to criminal activity. Accordingly, because the traffic stop was not justified at its inception as required under *Terry*, the court grants Mr. Lopez's motion to suppress.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress (doc.

#32) is granted.

**IT IS SO ORDERED.**

Dated this 30th day of April, 2007.

                                                  s/ John W. Lungstrum
                                                  John W. Lungstrum
                                                  United States District Judge