**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CARLOS LOPEZ, )<br>)<br>Defendant. )<br>)<br>_____) | Case No. 06-20183-JWL |

## MEMORANDUM AND ORDER

On May 30, 2008, a jury convicted the defendant, Carlos Lopez, of both counts of the indictment–one count of conspiracy to distribute and possess with intent to distribute methamphetamine and one count of possession with intent to distribute methamphetamine. The matter is before the court on the defendant's motion for new trial based on new evidence purporting to establish that the cooperating witness, Alfonso Urena-Bonilla, at trial provided false testimony against Mr. Lopez. The court held an evidentiary hearing on March 3, 2009. After careful consideration of the evidence, the court denies Mr. Lopez's motion for a new trial.

### I. Procedural Background

The defendant was convicted following a jury trial. The jury returned its verdict on May 30, 2008. Sentencing was set for August 25, 2008. Shortly before the

defendant's sentencing was to take place, counsel for the defendant received a sealed envelope that had been mailed to Melissa Harrison, Assistant Federal Public Defender, by one of her clients, Ivis Herandez. The sealed envelope contained a letter written in Spanish from Geovani San Pedro Lopez. The government had prosecuted Mr. San Pedro Lopez in the United States District Court of the District of Nebraska, and he had recently been transferred from the CCA facility in Leavenworth, Kansas to the Federal Bureau of Prisons facility in Waseca, Minnesota.

Upon receipt of the letter, counsel for the defense had the letter translated, and made arrangements to travel to interview Mr. San Pedro Lopez in the Waseca facility. Because of difficult circumstances surrounding this initial interview, defense counsel attempted unsuccessfully to arrange a second interview with Mr. San Pedro Lopez. Eventually, the court issued a Writ of Habeas Corpus Ad Testificandum requiring Mr. San Pedro Lopez's return to the District of Kansas, where Mr. Lopez's counsel was able to interview him a second time and acquire an affidavit from him. In this affidavit, Mr. San Pedro Lopez explained that on July 30, 2008 he overhead Mr. Urena-Bonilla talking with an unidentified Mexican inmate while in a medical treatment waiting room in CCA. According to Mr. San Pedro Lopez, Mr. Urena-Bonilla said he had lowered his own sentence and tricked the feds by giving them a scapegoat–a "stupid Cuban"–who Mr. Urena-Bonilla had owed $500 for transporting cars. Mr. Urena-Bonilla said that his lawyers had helped him with his story and that he was afraid to identify the real chauffeur because he was associated with the Tijuana cartel. Mr. San Pedro Lopez asked

Mr. Urena-Bonilla who the "stupid Cuban" was, and Mr. Urena-Bonilla said his name was "Carlos Lopez." According to Mr. San Pedro Lopez, when Mr. Urena-Bonilla found out Mr. San Pedro Lopez was also Cuban, Mr. Urena-Bonilla became agitated and asked to be removed from the medical unit.

On March 3, 2009, the court held an evidentiary hearing where Mr. San Pedro Lopez, after being reminded of his Fifth Amendment right not to incriminate himself, testified consistently with his sworn affidavit. Mr. San Pedro Lopez described how he mailed his letter to the Federal Public Defenders' Office, the conversation he overheard in CCA, and that he had never met Mr. Lopez on any prior occasion. The government called Mr. Urena-Bonilla who denied making any such statements, and reiterated that he was telling the truth at trial when he identified Mr. Lopez as the driver of the methamphetamine. The government also admitted into evidence sworn affidavits from Mr. Urena-Bonilla's attorneys, Roberto Yzaguirre and Brian L. Leininger. In these affidavits, both attorneys denied working with Mr. Urena-Bonilla to create a story to reduce his sentence. Both attorneys also admitted to having relatively minimal contact with their client and denied discussing the substance of what Mr. Urena-Bonilla should tell the government.

## II. Applicable Legal Standard

All parties agree on the standard applicable to the defendant's motion. Mr. Lopez's motion for new trial is based on newly discovered evidence and a five-part test is applied in determining whether such evidence warrants a new trial. Mr. Lopez must

show that "(1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that a new trial would probably produce an acquittal." *United States v. Higgins*, 282 F.3d 1261, 1278 (10th Cir. 2002) (quoting *United States v. Quintanilla*, 193 F.3d 1139, 1147 (10th Cir. 1999)). "A motion for a new trial based on newly discovered evidence is not favorably regarded." *United States v. Trujillo*, 136 F.3d 1388, 1294 (10th Cir. 1998) (citing *United States v. Youngpeter*, 986 F.2d 349, 356 (10th Cir. 1993)). The Tenth Circuit has explained that "[a]lthough a trial court is afforded discretion in ruling on such a motion, and is free to weigh the evidence and assess witness credibility, a motion for new trial is regarded with disfavor and should only be granted with great caution." *Quintanilla*, 193 F.3d at 1146 (citing *Tibbs v. Florida*, 457 U.S. 31, 37-38, n.11 (1982); *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir.1997)) (internal citations omitted).

## III. The Government's Case at Trial

*Testimony of Special Agent Dana Suchma at Trial Concerning His Initial Surveillance of the Activity at the Best Western Hotel and Sonic Drive-In Restaurant*

On the morning of December 11, 2006, SA Suchma[1] was performing drug interdiction surveillance at a hotel located in Kansas City, Kansas. Approximately 9:00

---

[1]SA Suchma has worked with the DEA since 1997. He specializes in drug investigations and has experience conducting drug interdiction activities at hotels and motels.

am, SA Suchma drove through the hotel parking lot, and entered the hotel lobby where he checked the guest registry in an attempt to identify anyone fitting the criteria for being involved in drug smuggling or bulk cash smuggling.  Having identified one possible subject, SA Suchma returned to his vehicle to run a computer check on him.  While running this computer check on this unrelated subject, SA Suchma, around 9:20 a.m., noticed a red truck in the parking lot of the hotel with its engine running.  He further observed that the truck had Texas plates and that cigarette smoke appeared to be emanating from the driver's side window.  Thinking this truck might be related to his earlier check of the individual from the guest registry as that individual also happened to be from Texas, SA Suchma ran a check of the license plate on the truck.  After running a check of the license plate, SA Suchma discovered that the truck was registered to Carlos Lopez in Pharr, Texas.[2]  SA Suchma then verified with the hotel clerk that a Carlos Lopez had checked in around 10:38 the previous evening, had checked out around 9:00 that morning, and had paid cash for the room.[3]

At approximately 10:15 am, SA Suchma watched as the red truck exited the hotel

---

[2]SA Suchma consulted a map and discovered that Pharr is a suburb of McAllen, Texas, a town located near the border with Mexico.

[3]SA Suchma, after repositioning his own vehicle and while conducting surveillance on the red truck which was still in its original position in the hotel parking lot, contacted other people in his group and requested assistance.  Task Force Officer Jim Morgan and Task Force Officer Mike Stephens responded to his request and set up in different vantage points also to conduct surveillance on the red truck.

and entered the parking lot of a Sonic drive-in restaurant located next door.[4]  SA

Suchma also observed a green truck exit the hotel parking lot–seemingly in tandem with

the red truck–follow the red truck into the drive-in parking lot, and pull into the space

directly next to the red truck.[5]  The two trucks were now positioned in adjacent stalls of

the Sonic drive-in.  At that time, the driver of the red truck, Mr. Lopez, exited his vehicle

and walked to the front of it.  At approximately the same time, the passenger of the green

truck, later identified as Mr. Urena-Bonilla, exited that vehicle holding a white

Styrofoam cooler with red handles. The passenger proceeded to walk to the rear of the

green truck and in between the two trucks, to place the cooler in the bed of the red truck

driven by Mr. Lopez.  While these movements were being observed by SA Suchma, he

was communicating via radio with TFO Morgan and Stephens.  TFO Stephens then

made the observation over radio that a subject wearing an orange ball cap and an orange-

stripped shirt, ultimately determined to be Hugo Nunez-Ayala,[6] was leaning on the bed

---

[4]When the red truck began to move, SA Suchma prepared to conduct moving
surveillance of the truck; however, after observing the red truck enter the Sonic drive-in
space, SA Suchma re-positioned his vehicle to re-establish surveillance.

[5]None of the officers observed the green truck actually enter the hotel parking lot
and no substantial contact between the two vehicles was observed in the hotel parking
lot.  SA Suchma did explain that he first observed the green truck as it drove over to the
area of the red truck and hesitate in the middle of the hotel parking lot behind the red
truck.  However, no one exited either vehicle at this time, and it did not appear as if the
occupants of either vehicle tried to speak to one another while in the hotel parking lot.

[6]Hugo Nunez-Ayala also used the name Ricardo Cardenas-Corona; however, the
witnesses at trial all referred to him as Mr. Nunez, and so for ease of reference, the court
will do the same.

(continued...)

of the green truck on the passenger's side seemingly scanning the area.[7]

Subsequently, Mr. Lopez re-entered the red truck, and began to back out of the stall, and proceed to exit the parking lot. At this point, it was communicated over the radio that the passenger from the green truck walked over to Mr. Lopez and engaged in a brief conversation with him. Following that, Mr. Lopez exited the parking lot and proceeded south on I-35.[8] Prior to the brief exchange between the passenger and Mr. Lopez, SA Suchma did not personally observe any contact between Mr. Lopez and any of the individuals riding in the green truck.

At this point, SA Suchma telephoned one of the DEA task force officers primarily assigned to the Kansas Highway Patrol and informed him of what had been observed and requested that he arrange for a trooper to perform a car stop on Mr. Lopez's vehicle. During the course of the moving surveillance of the red truck, SA Suchma received a phone call from Trooper Tom Catania who, after being told what had occurred so far,

---

[6](...continued)
SA Suchma explained that while he did not know what Mr. Lopez was doing while Mr. Urena-Bonilla placed the cooler into the green truck bed, he did not observe Mr. Lopez approach or speak with either Mr. Urena-Bonilla or Mr. Nunez while on Mr. Lopez was outside his truck at the Sonic.

[7]SA Suchma felt that this individual in orange was conducting counter-surveillance, and as a result, decide to move to a less exposed location to continue his surveillance. At some point in this sequence of basically contemporaneous events, a fourth member of the DEA team, Task Force Officer Sarah Eberhard, arrived on the scene.

[8]Three of the officers conducting surveillance followed Mr. Lopez's red truck, while one stayed behind to follow and observe the green truck.

agreed to assist by effectuating a traffic stop of the red truck.[9] SA Suchma and the other two officers maintained visual surveillance of the red truck continuously from its exiting the Sonic restaurant until they observed the troopers take over the surveillance.

*Testimony of Task Force Officer Mike Stephens at Trial Concerning His Surveillance of the Activity at the Best Western Hotel and Sonic Drive-In Restaurant*

TFO Stephens[10] received a telephone call from SA Suchma on the morning of December 11, 2006. SA Suchma requested assistance in surveilling a potential subject at the Best Western Hotel in Kansas City, Kansas. TFO Stephens arrived at the scene and set up his surveillance of the red truck directly across the street from the hotel in a parking lot of a Mexican restaurant.

After approximately twenty or thirty minutes observing the red truck from this vantage point, TFO Stephens observed a green truck drive very slowly past the red truck.[11] Shortly after this, the red truck backed out of the parking space, pulled out of the hotel parking lot, and immediately turned into the Sonic drive-in. TFO Stephens

---

[9]Trooper Catania was accompanied by Trooper Charles Lovewell, also of the Kansas Highway Patrol. SA Suchma explained that the DEA utilizes troopers in situations like these so that the troopers can make their own case and it does not become necessary to reveal the existence of an on-going drug investigation.

[10]At the time of trial, Officer Stephens was a deputy sheriff with the Platte County Missouri Sheriff's Department, and was assigned to the DEA Task Force. He had been with the Plate County Sheriff's Department for over fifteen years and had been assigned to the DEA Task Force for over three years.

[11]TFO Stephens did not see anyone get out of either truck at this point or communicate in any way with each other at this point.

observed the green truck following and pulling into an adjacent stall at the Sonic.[12] From his new vantage point, TFO Stephens observed a Hispanic male in an orange hat and orange-striped t-shirt, later identified as Mr. Nunez, leaning against the passenger-side bed of the green truck and scanning the area. Despite being in an unmarked vehicle and in plain clothes and never observing this individual "lock in" on him, TFO Stephens again re-positioned his vehicle pulling completely out of sight on the other side of the hotel because he believed this individual was conducting counter-surveillance.

*Testimony of Task Force Officer Jim Morgan at Trial Concerning His Surveillance of the Activity at the Best Western Hotel and Sonic Drive-In Restaurant*

TFO Morgan[13] received a phone call from SA Suchma, requesting his assistance at the Best Western Hotel in Kansas City, Kansas, on the morning of December 11, 2006. TFO Morgan arrived on the scene and set up surveillance initially directly across the street from the hotel. When TFO Morgan arrived, the red truck was still stationary in its original position in the hotel parking lot. Approximately twenty minutes after he arrived, TFO Morgan observed the green truck drive behind the red truck, which was still in its parking place, and momentarily stop behind the red truck.[14] Shortly after that,

---

[12]At this point, TFO Stephens re-positioned his own vehicle to a side street directly across from the Sonic to get a better view of both trucks.

[13] TFO Morgan at the time of trial was a police officer with the Kansas City, Missouri Police Department. He was assigned to a DEA interdiction task force as a task force officer, and he had been a police officer for approximately twenty years.

[14]TFO Morgan noted that he did not see any individual get out of either truck or
(continued...)

9

TFO Morgan observed the red truck exit the hotel parking lot onto Southwest Boulevard and immediately turn into the Sonic drive-in parking lot. TFO Morgan observed the green truck take the same path as the red truck–appearing to follow it–and pull into the adjacent stall on the red truck's passenger side.[15] At this point, TFO Morgan was observing the sides of the trucks, and over the radio, he heard surveillance advise that an individual, later identified as Mr. Lopez, had exited out of the red truck; surveillance also advised that a person, later identified as Mr. Nunez, had exited the green truck, walked around to the passenger's side, and was standing on the passenger's side of the green truck. TFO Morgan also observed this person, who was wearing an orange-striped shirt and standing toward the back of the bed of the truck, but TFO Morgan could not see a great deal of the green truck as the red truck was larger and obstructed his view. Shortly after this, TFO Morgan heard surveillance advise that another male wearing a jean jacket, later identified as Mr. Urena-Bonilla, had exited the passenger's side of the green truck with a white cooler with red handles and he was walking around the vehicles. TFO Morgan also observed this individual place the cooler in the back of the red truck.

---

[14](...continued)
attempt to communicate with each other while they were in the Best Western parking lot.

[15]After both trucks entered the Sonic parking lot, TFO Morgan re-positioned his own vehicle to the restaurant parking lot directly across the street from the Sonic. TFO Morgan admitted in re-positioning his own vehicle he may have lost sight of the two trucks for a few seconds, but as he was pulling into the restaurant parking lot, the red truck was just pulling into the parking stall at the Sonic.

TFO Morgan saw Mr. Urena-Bonilla stand there momentarily, but TFO Morgan then lost sight of what this individual was doing as another car had pulled into a parking stall of the Sonic that blocked his ability to observe the two trucks. The car was parked there for about a minute as someone ran in and out of the Sonic and then the car left. Soon after this car left, the red truck backed out of the parking stall and pulled forward to straighten up. At this point, Mr. Urena-Bonilla walked up, appeared to lean into the window, and had an approximately three minute conversation with Mr. Lopez, the driver of the red truck. Prior to this conversation, TFO Morgan did not observe any of these individuals speak with one another.

After this approximately three minute conversation, Mr. Urena-Bonilla stepped away, and the red truck pulled out of the Sonic parking lot. TFO Morgan stayed with the green truck while the other members of the team followed the red truck. Mr. Urena-Bonilla returned to the green truck, which sat at the Sonic for approximately fifteen minutes after the red truck left. TFO Morgan observed a Sonic employee approach the truck, but he could not see what she took to the truck. Shortly after this, the green truck also left the Sonic, and TFO Morgan followed.

*Testimony of Alfonso Urena-Bonilla at Trial*

Mr. Urena-Bonilla described how he first met Mr. Lopez randomly when Mr. Urena-Bonilla had car trouble in Texas in May 2006. The next time the two met was in October 2006 when they met in Dallas with an individual called Pachichi because Mr. Urena-Bonilla was looking for someone to transport methamphetamine for him. Mr.

Urena-Bonilla also described his involvement with drug trafficking and how he would get drugs into the United States from Mexico. Mr. Urena-Bonilla explained that he had previously delivered methamphetamine and cocaine to Mr. Nunez and how on these previous occasions he had used his wife and sister-in-law to smuggle and carry the drugs in. Mr. Urena-Bonilla then described how he came to Kansas City to get back some of the methamphetamine that had previously been delivered to Mr. Nunez so Mr. Lopez could transport it to Atlanta as it was not moving well in Kansas City. Mr. Urena-Bonilla also explained that he decided to use Mr. Lopez to transport the methamphetamine because he did not want to risk his family any longer in transporting the drugs themselves.

On December 8, 2006, Mr. Urena-Bonilla delivered with his wife's assistance five kilograms of cocaine to Mr. Lopez in Pharr, Texas. Mr. Urena-Bonilla then traveled to Dallas and again met up with Pachichi and Mr. Lopez on December 10. Then Mr. Urena-Bonilla and Mr. Lopez traveled separately to the Kansas City area. Mr. Urena-Bonilla drove through Oklahoma and picked up another friend, Oscar Monte, to help with the driving and translating. On the evening of December 10, Mr. Urena-Bonilla bought a Styrofoam cooler from a gas station along I-35 to store the methamphetamine once he picked it up from Mr. Nunez.

On December 11, 2006, Mr. Urena-Bonilla and Mr. Monte went to pick up the methamphetamine. They left Mr. Urena-Bonilla's truck at Mr. Nunez's and Mr. Nunez drove them first to another house to pick up the methamphetamine and then to meet up

with Mr. Lopez at the Sonic. Upon arriving at Sonic, Mr. Urena-Bonilla got out of the green truck to put the cooler in Mr. Lopez's red truck. As Mr. Lopez was driving away, Mr. Urena-Bonilla briefly spoke with him at the driver's side window of the red truck and Mr. Lopez asked for $500 toward payment for driving the methamphetamine.

After leaving the Sonic, Mr. Urena-Bonilla, Mr. Nunez, and Mr. Monte first went to an Office Depot, and then went to look at some trucks at an auto shop–the location DEA ultimately arrested them. Upon being arrested, Mr. Urena-Bonilla was interviewed, and initially he denied any knowledge of the methamphetamine in the cooler. Initially, he told the agents he was in Kansas City to buy used cars. He explained that he had always heard that you were not supposed to talk until you had an attorney. Eventually, Mr. Urena-Bonilla agreed to speak with the DEA agents because his attorney advised him to do so. However, Mr. Urena-Bonilla also testified that his attorney never discussed any of the evidence in the case with him and therefore, he was not aware of what anyone else had said or done in the investigation. In this first interview in February 2007, Mr. Urena-Bonilla admitted his involvement with the seven packages of methamphetamine, told the agents about the involvement of Mr. Nunez and Mr. Lopez, but denied that his family was involved in drug trafficking. In the first interview, Mr. Urena-Bonilla gave false information concerning who arranged transportation for the drugs from Los Angeles to Kansas City as Mr. Urena-Bonilla was attempting to hide the involvement of his brother in his drug trafficking. In his second interview in April 2007, Mr. Urena-Bonilla admitted his family's involvement. Mr.

Urena-Bonilla also testified that the only person who had asked him to change his story was Mr. Lopez while they were both incarcerated at CCA.

*Testimony of Trooper Charles Lovewell at Trial Concerning the Traffic Stop and Search of Mr. Lopez's Truck*

On December 11, 2006, Trooper Lovewell[16] was asked to assist the DEA by effectuating a traffic stop of a vehicle that had been observed in a Best Western parking lot engaged in some suspicious activity.[17] Trooper Lovewell, along with Lt. Catania, were sitting on the ramp from 151st Street to I-35 South. Lt. Catania was on the phone with the DEA agents that were following the truck, and as Trooper Lovewell and Lt. Catania observed the truck go by on the interstate, they went down the ramp to follow

---

[16]At the time of trial, Trooper Lovewell had been a trooper with the Kansas Highway Patrol for five years.

[17]Lt. Catania was also called to testify at trial. On the morning of December 11, 2006, Lt. Catania was contacted by SA Suchma who asked if a trooper could try and make a stop on a vehicle the DEA had been surveilling. SA Suchma told Lt. Catania he had been doing hotel-motel interdiction and explained what had transpired at the Kansas City, Kansas Best Western Hotel and Sonic drive-in. Lt. Catania, while serving as a task force officer, had experience with hotel-motel interdiction, and based on the information told to him, Lt. Catania believed there was a high likelihood the cooler contained either drugs or money.

Lt. Catania then contacted Trooper Lovewell and conveyed the information to him, and they both got into a patrol car and went out on I-35 to wait. Lt. Catania remained in contact with SA Suchma to keep track of the location of the vehicle in question.

Once the truck was stopped, Trooper Lovewell was the primary contact officer with Mr. Lopez. However, Lt. Catania did ask Mr. Lopez for his social security card, and had a conversation with him about where he was born. Lt. Catania also noted Mr. Lopez's extreme nervousness–namely, the extreme shaking of his hands.

it.

After following the truck for around a half-mile to a mile, they observed what they believed to be a traffic violation–failure to maintain a single lane–and they initiated their emergency equipment and pulled the truck over.[18] Trooper Lovewell made contact with the driver and informed him of the violation and asked for his driver's license and proof of insurance. The driver provided the requested information which identified him as Carlos Lopez. At this point, Trooper Lovewell asked Mr. Lopez about his travels, and at first, Mr. Lopez stated that he was coming from Miami to Dallas, Texas, but when Trooper Lovewell asked him to confirm what he said, he changed his story and said that he had gone from Miami to Dallas and then was going from Dallas to Kansas City and back to Dallas.[19] When asked why he was coming up to Kansas City, Mr. Lopez explained that he was buying a house from an individual up here–the house was in Texas, but the seller was living in Kansas City. Trooper Lovewell asked Mr. Lopez why they did not mail or fax the papers, and he responded that he had to sign them in person.

---

[18]Upon the activation of the emergency lights, the video equipment of Trooper Lovewell's patrol car also turns on. Therefore, the traffic stop was recorded; however, there was a problem with Trooper Lovewell's audio, and it intermittently cut in and out during the stop. The government played a portion of the video recording during the trial as Trooper Lovewell explained at various points what was going on when the audio would cut out and the government admitted the videotape in its entirety into evidence.

[19]All of this initial interaction took place in English, and Trooper Lovewell testified that Mr. Lopez did not appear to have any difficulty understanding the questions, although he thought he may have had to repeat a word or two or speak a little slower.

After this initial contact, Trooper Lovewell returned to his patrol car, where Lt. Catania had already given dispatch Mr. Lopez's information. When writing out the warning for the traffic violation, they were informed that dispatch wanted to confirm some information and get a social security number so Lt. Catania approached Mr. Lopez for this information and then returned to the patrol car and gave this additional information to dispatch. While waiting for a response, Trooper Lovewell noticed something about the truck that did not appear consistent with the information he had about the year of the vehicle so he re-approached Mr. Lopez to confirm the year of the truck with him. Mr. Lopez provided documents from when he purchased the truck, and they discussed how Mr. Lopez had bought the truck on August 16 of that year. While Trooper Lovewell was having this conversation with Mr. Lopez, Lt. Catania approached and asked how many miles he had on the truck. Mr. Lopez said there were 14,000 miles on the truck.[20] Trooper Lovewell returned to his patrol car, finished filling out the warning, and then issued the citation and returned all of his documents to Mr. Lopez. After telling him to drive safe, Trooper Lovewell closed the passenger's side door and began to walk away.

---

[20]This struck Trooper Lovewell as an excessive amount of miles to put on a truck in only four months of ownership. After Mr. Lopez was arrested Trooper Lovewell was transporting him to Troop A, the trooper asked Mr. Lopez his occupation, and Mr. Lopez explained that he was an 18-wheel truck driver, who drove his 18-wheeler five days a week. This information further enhanced Trooper Lovewell's suspicions concerning the number of miles on the truck as Mr. Lopez was apparently only using the truck two days a week and had only owned it for four months.

After a few seconds, he turned back around and knocked on the window again to gain Mr. Lopez's attention. At this point, Mr. Lopez had his hand on the gear shift and was putting the truck into gear. Mr. Lopez made a gesture with his arm like come in, and Trooper Lovewell re-opened the door and asked Mr. Lopez if he could ask a few more questions. Trooper Lovewell then asked if he could search his vehicle–a question Trooper Lovewell repeated several times.[21] Mr. Lopez eventually said yes, and Trooper Lovewell asked him to step out of the truck. Lt. Catania walked to the driver's side, met Mr. Lopez, and escorted him to the back of the truck.

Trooper Lovewell began a short search of the interior of the truck and then moved to the bed of the truck. He looked inside the white Styrofoam cooler with red handles, and observed several oranges inside. After shifting the oranges, Trooper Lovewell, noticed several bundles that had been wrapped in plastic and appeared to be drugs.

Shortly after the drugs were found, Mr. Lopez was arrested, and Trooper Lovewell read him his *Miranda* rights. Mr. Lopez agreed to talk so Trooper Lovewell asked him about the drugs found in the back of his truck. According to Trooper Lovewell, Mr. Lopez acted like he did not know what Trooper Lovewell was talking about. When Trooper Lovewell referred to the cooler, Mr. Lopez explained that two

---

[21]For the first time during their exchange, it appeared as though Mr. Lopez was having trouble understanding what Trooper Lovewell was asking him. However, Trooper Lovewell testified that at the time Mr. Lopez gave his consent, Trooper Lovewell felt one hundred percent sure that he understand what he was saying and asking.

guys had approached him in the parking lot,[22] put the cooler in the back of his truck and said they would be back in an hour if he could watch it for them.  Mr. Lopez further explained that he eventually forgot to wait, and he drove off before the men came back for their cooler.

Trooper Lovewell transported Mr. Lopez to Troop A, while Lt. Catania drove the truck to Troop A.  During the drive, Trooper Lovewell asked Mr. Lopez about his occupation, and where he bought the truck and how much he paid for it.  After arriving at Troop A, Trooper Lovewell removed Mr. Lopez from the patrol vehicle, and at the office in Olathe, Trooper Lovewell took Mr. Lopez into a meeting room, and removed everything from his pockets.  Trooper Lovewell asked him how much cash he had on him and Mr. Lopez said he had $500.  Trooper Lovewell then informed Mr. Lopez that DEA agents wanted to speak with him.

*Testimony of Special Agent Suchma Concerning Cellular Phone Records*

While the Kansas Highway Patrol troopers were conducting the traffic stop and search of Mr. Lopez's truck, SA Suchma and the other DEA personnel who had been following Mr. Lopez's truck pulled into a nearby weigh station to wait.  After being notified by Trooper Catania that Mr. Lopez had been arrested and that they were taking Mr. Lopez to Troop A, SA Suchma and the other DEA personnel responded to Troop A in Olathe.  Upon being notified that Kansas Highway Patrol had discovered drugs in the

---

[22]Either the Sonic or Best Western parking lot, Trooper Lovewell could not recall where exactly Mr. Lopez said and he did not include the information in his report.

cooler of the red truck, SA Suchma called TFO Morgan to inform him that methamphetamine had been found in the cooler they had observed being transferred at the Sonic that morning, to find out if TFO Morgan still had surveillance on the green truck–which he did, and consequently, it was decided that TFO Morgan would make contact with the individuals from the green truck.

Once SA Suchma arrived at Troop A, Trooper Catania gave him the cooler with seven bundles of methamphetamine and oranges inside. SA Suchma took charge of the evidence recovered from Mr. Lopez's truck, and then SA Suchma was present for a large portion of the interview of Mr. Lopez at Troop A as well.[23]

SA Suchma also testified that a cell phone (786-402-0985) was recovered from Mr. Lopez's person on December 11, 2006 and a cell phone (956-789-4195) was recovered from Mr. Urena-Bonilla's person when he was ultimately arrested on December 11, 2006. SA Suchma obtained records pertaining to these two phones following the arrests by issuing subpoenas to the cell phone companies for the subscriber information and toll records from December 1, 2006 to December 11 or 12.[24] SA Suchma then testified about the pattern of contact between the phones associated

---

[23]TFO Eberhard prepared the report concerning Mr. Lopez's interview and was present for the entire interview, and while SA Suchma was present for a great deal of the interview, he occasionally stepped out to make and receive phone calls.

[24]SA Suchma explained that he commonly does this in an effort to show a relationship between the owners of the phones and also to determine if there is a pattern of contact between the owners leading up to the seizure or arrest.

with Mr. Lopez and Mr. Urena-Bonilla.[25]

*Testimony of Lucretia Weber Concerning Lab Results*

Ms. Weber, a forensic chemist with the DEA, explained that in January 2007 she tested the methamphetamine seized from the cooler in Mr. Lopez's truck. In total the seven packages seized contained 2692 grams; six of the packages were 100 percent pure D methamphetamine hydrochloride, while the seventh package was 84 percent D methamphetamine hydrochloride and 16 percent dimethyl sulphone (MSN)–a common cutting agent for methamphetamine.

*Testimony of Task Force Officer Jim Morgan Concerning His Surveillance of the Green Truck*

After the green truck left the Sonic restaurant, TFO Morgan continued to conduct surveillance on it–first following it to an Office Max, and then to a SMS Auto and Muffler Shop in Kansas City, Kansas. At the Office Max, three individuals exited the vehicle and while waiting for them to return to the truck, TFO Morgan requested and received help to continue to conduct surveillance.[26] At the auto shop, the individuals exited the truck and looked at the various vehicles in the lot. TFO Morgan maintained

---

[25]The pattern of phone contact included one phone call on December 2, no phone contact on December 3, six phone calls on December 4, no phone contact on December 5 or 6, three phone calls on December 7, no phone contact on December 8, two phone calls on December 9, six phone calls on December 10, and four phone calls on December 11.

[26]Task Force Officer Norma Lorenzo and Task Force Officer Elliott Riggins responded to TFO Morgan's request for assistance.

surveillance of these individuals until he was contacted by SA Suchma who advised him that methamphetamine had been discovered in the cooler of the red truck and requested that TFO Morgan arrest the individuals from the green truck. Mr. Urena-Bonilla, Mr. Nunez, and Mr. Monte, the previously unseen third individual, were arrested.

TFO Lorenzo read Mr. Urena-Bonilla his *Miranda* rights in Spanish, and Mr. Urena-Bonilla was asked about his knowledge of the contents of the cooler. At that time, Mr. Urena-Bonilla explained that there were oranges in the cooler. When he was specifically asked about narcotics, Mr. Urena-Bonilla stated that the cooler may have contained narcotics because he knew Mr. Nunez was involved with narcotics, but he did not know for sure. He also said that Mr. Nunez had told him to put the cooler in the red truck when they had arrived at the Sonic. Mr. Urena-Bonilla also explained that he had arrived in Kansas City from Texas on December 10 to meet with Mr. Nunez; that he had left his own truck parked on the street in front of Mr. Nunez's house; and that the cooler was in the green truck before he arrived. However, a search executed on Mr. Urena-Bonilla's own truck revealed a receipt from a gas station in Oklahoma for a Styrofoam cooler exactly like the one put in Mr. Lopez's truck at the Sonic restaurant.

*Testimony of Task Force Officer Sarah Eberhard Concerning Her Interrogation of Mr. Lopez*

On the morning of December 11, 2006, TFO Eberhard[27] responded to SA

---

[27]TFO Eberhard at the time of trial was a sergeant with the Missouri State
(continued...)

Suchma's request for assistance at the Best Western Hotel in Kansas City, Kansas. However, when she arrived and was setting up her position to conduct surveillance, the red and green trucks were already in their positions at the Sonic restaurant. She explained that the red truck started to leave the Sonic not long after she arrived, and that she was one of the officers tasked to continue surveillance on the red truck as it drove south along I-35.

After Mr. Lopez was arrested by Kansas Highway Patrol, both TFO Eberhard and SA Suchma went to Troop A in Olathe to process evidence and speak with Mr. Lopez. Upon their arrival at Troop A, SA Suchma and TFO Eberhard were introduced to Mr. Lopez. SA Suchma provided Mr. Lopez with a DEA Form 13-A card that contains the *Miranda* warning–one side in English and one side in Spanish–and directed Mr. Lopez to read it.[28] After appearing to read the card, Mr. Lopez stated he understood what he read and agreed to answer the questions of SA Suchma and TFO Eberhard.

SA Suchma first asked Mr. Lopez why he was in Kansas. Mr. Lopez explained that he was in town to sign some paperwork relating to a three-acre lot of land he was

---

[27](...continued)
Highway Patrol assigned to the DEA Interdiction Task Force out of Kansas City, Missouri. She had been with the Missouri State Highway Patrol for over fifteen years and had been assigned as a task force officer for over four years.

[28]While SA Suchma directed Mr. Lopez to read the Spanish side of the *Miranda* card, the entire conversation with SA Suchma and TFO Eberhard occurred in English. TFO Eberhard explained that Mr. Lopez appeared to have no trouble understanding them.

purchasing in McAllen, Texas. He further explained that he met an individual named Avelino at a Sonic restaurant next to a Best Western Hotel in Kansas City, Kansas to sign the paperwork. Mr. Lopez stated that Avelino's uncle, who was the owner of the Texas property in question, was with Avelino at this time, but Mr. Lopez did not know the uncle's name, and that he did not have a phone number for Avelino because it always came up as blocked on his cell phone caller id. TFO Eberhard asked Mr. Lopez if he had any paperwork to show he had signed for the property, and Mr. Lopez replied that he did not as he signed the paperwork and then gave it back to Avelino who was supposed to get it notarized and then send him a copy in the mail at a later date.

TFO Eberhard then asked if Mr. Lopez had driven directly from Florida to Kansas City. Mr. Lopez explained that he had not driven directly to Kansas City; rather, he had stayed with friends in Dallas, Texas for several days. When TFO Eberhard attempted to find out exactly with whom Mr. Lopez had stayed in Texas, he said it was a girlfriend, but he did not give a name. After staying in Texas for several days, Mr. Lopez drove to Kansas City and spent the night at a Best Western Hotel in Kansas City, Kansas.

On the morning of December 11, 2006, Mr. Lopez checked out of his hotel and went to his truck in the hotel parking lot and waited for Avelino to call him. While he was waiting for Avelino to call him, Mr. Lopez noticed three men, whom he described as laborers in jumpsuits, in the parking lot between the hotel and the Sonic restaurant. One of these men, a Hispanic male, approached him and asked him for some money to buy something to eat, and Mr. Lopez gave him a five dollar bill to do so. A short while

later the same man approached Mr. Lopez and asked him for a cigarette. Then the two other males of unknown race approached, and one said something in English to the Hispanic male that Mr. Lopez did not understand. At this point, the Hispanic male asked Mr. Lopez if he was going to be at his location for a while; to which Mr. Lopez responded that the was waiting for a friend. The Hispanic male then asked Mr. Lopez if he could watch a cooler for him for a little while and Mr. Lopez agreed.

Approximately twenty-five minutes after the cooler was placed in his truck in the Best Western Hotel parking lot, Mr. Lopez drove to the Sonic to meet Avelino. Mr. Lopez then stated that he met with Avelino and his uncle at the Sonic and signed the papers for the property in McAllen, Texas. Upon being confronted with the fact that the cooler contained a large amount of narcotics worth a great deal of money that would not be left in an unknown individual's possession, Mr. Lopez explained that he thought the three individuals had become scared by sirens. He further explained that when he was checking out of the hotel, someone in the lobby was having a medical condition for which EMS was called. He thought that possibly these three men were scared because they thought the sirens were law enforcement officers and not EMS personnel.

At this time, TFO Eberhard called an ICE Spanish speaker, TFO Tim Ditter.[29]

---

[29]TFO Eberhard again explained that she and Mr. Lopez did not have trouble understanding one another during the interview. Rather, she called TFO Ditter first because what Mr. Lopez was telling her did not coincide with what the DEA agents had observed take place at the Best Western Hotel and Sonic, and secondly because in her experience suspects whose first language is not English sometimes, despite initially

(continued...)

TFO Eberhard told TFO Ditter that they had an investigation with a Spanish-speaking subject who had given a statement in English and that she wanted to see if the individual would tell the same story in Spanish. However, she did not tell TFO Ditter any of the details Mr. Lopez had already revealed to her. Next, TFO Eberhard told Mr. Lopez that she had a fluent Spanish speaker on the phone, asked Mr. Lopez to tell TFO Ditter in Spanish what he told her initially in English, and handed him the phone. Mr. Lopez then had about a five-minute conversation in Spanish with TFO Ditter. After this conversation, TFO Eberhard again spoke with TFO Ditter, and TFO Ditter confirmed that Mr. Lopez told him the same general story concerning coming to Kansas City to sign paperwork for a Texas property, encountering some people who he did not know who wanted him to watch a cooler for them, and then forgetting about the cooler once he had taken care of the paperwork situation.

After the phone conversation, SA Suchma confronted Mr. Lopez with the fact that he had been under surveillance, that the cooler was placed in his truck in the Sonic parking lot–not the Best Western parking lot–and that Mr. Lopez had a conversation with the individual who had placed the cooler in his truck. When told for the first time that he had been under surveillance, according to TFO Eberhard, Mr. Lopez looked defeated and responded by saying: "if you were watching me, then you know that I never touched

---

[29](...continued)
speaking English, later claim that they did not understand English. Therefore, TFO Eberhard called TFO Ditter to confirm that what Mr. Lopez was telling her in English would also be what he would tell a fluent Spanish speaker.

the cooler and that my prints are not on it." At this point, the interview with Mr. Lopez was terminated.

*Testimony of Task Force Agent Tim Ditter Concerning His Discussion over the Phone with Mr. Lopez*

TFO Ditter[30] received a telephone call from TFO Eberhard on December 11, 2006. TFO Eberhard requested that TFO Ditter speak in Spanish with an individual the DEA had encountered earlier that day at one of the local hotels. However, TFO Eberhard did not give any details regarding the investigation or what she had already discussed with this individual.

TFO Ditter then spoke with Mr. Lopez on the phone. TFO Ditter introduced himself and asked the individual his name. Next, TFO Ditter asked if Mr. Lopez had been read his rights, and Mr. Lopez confirmed that he had. TFO Ditter then again read Mr. Lopez his rights in Spanish,[31] and confirmed that Mr. Lopez understood his rights and that he was willing to speak.

TFO Ditter asked Mr. Lopez what had occurred that day and what had brought

---

[30]TFO Ditter at the time of trial was a special agent with Immigration and Customs Enforcement (ICE). He had worked in this capacity for approximately nine years, and prior to that, he had been a United States Border Patrol agent for approximately six years. TFO Ditter was assigned as a task force officer to the DEA's long term investigation group.

[31]TFO Ditter explained that he read Mr. Lopez his rights again in Spanish because in his experience sometimes an individual who is bilingual will claim to understand and speak English at the scene of an arrest or encounter, but then subsequently in legal proceedings the individual's understanding of English will diminish dramatically.

him to Kansas. In response, Mr. Lopez explained he had come to Kansas City to sign some papers relating to some land he was purchasing in the Rio Grande Valley. Then TFO Ditter asked who was selling this land and who was getting him to sign these papers, and Mr. Lopez responded it was an individual by the name of Avelino. TFO Ditter asked for Avelino's last name, and Mr. Lopez was unable to provide one. Next, TFO Ditter asked whether anything else had happened that day that would result in the current situation. Mr. Lopez stated that while he was waiting for Avelino to arrive, three individuals approached him. One of whom asked if he could watch a cooler for a bit while they ran some errands. Mr. Lopez agreed, and this individual put the cooler in the back of Mr. Lopez's truck. However, when Avelino arrived and Mr. Lopez took care of the paperwork, Mr. Lopez forgot about the cooler and drove off with it still in his possession. After gaining this explanation, TFO Ditter spoke with TFO Eberhard again and related to her what Mr. Lopez had explained to him.

**IV. The Defense's Case at Trial**

*Testimony of Carlos Lopez at Trial*

Mr. Lopez explained that he had left Florida in December 2006 and first gone to Texas on his way to Kansas City because he was selling a trailer in South Texas. Then he had come to Kansas City to look at mobile homes in Emporia and to attend three auctions for used cars. Mr. Lopez explained that he first met Mr. Urena-Bonilla on a highway in Texas when Mr. Urena-Bonilla's car was broken down and Mr. Lopez was transporting produce in an 18-wheeler truck. Mr. Lopez stopped and fixed Mr. Urena-

Bonilla's car, and they exchanged telephone numbers because Mr. Lopez was in the business of transporting cars.

Mr. Lopez testified that Mr. Urena-Bonilla had him transport cars for him on one occasion and that Mr. Urena-Bonilla still owed him $500 for doing so. He then explained that the reason they met up at the Sonic on the morning of December 11 was for Mr. Urena-Bonilla to give Mr. Lopez the money he owed him. Mr. Lopez testified that he met with Avelino concerning the land in Texas in the parking lot of his hotel outside of his room before he checked out of the hotel. After checking out of the hotel, Mr. Lopez made himself some coffee and waited to hear from Mr. Urena-Bonilla. When he spoke with Mr. Urena-Bonilla on the phone, Mr. Urena-Bonilla said he needed to get breakfast so they agreed to meet at Sonic. Upon arriving at Sonic, Mr. Lopez explained that he got out of his truck and met with Mr. Urena-Bonilla to get his money. He denied seeing Mr. Urena-Bonilla put the cooler into his truck and denied that anyone else got out of the truck Mr. Urena-Bonilla was riding in. Once he received his money, Mr. Lopez said he re-entered his truck and got on the highway to go to Emporia to look at the mobile homes.

Mr. Lopez testified that he did not understand 90 percent of what the troopers asked him when they stopped him on the highway. He also stated that once he arrived at the police station he was interviewed by a gentleman and a lady, and eventually, he was put on the phone with a man who spoke Spanish who asked him what the methamphetamine was doing in his truck. Mr. Lopez stated that he denied knowing

about it and that it was not his. Mr. Lopez also testified that he did not know that Mr. Urena-Bonilla was involved in drug-trafficking.

## V. Analysis

There is no dispute in this case that the evidence at issue was discovered after trial, thus satisfying the first *Higgins* factor. The letter from Mr. San Pedro Lopez arrived at the Federal Public Defenders' Office shortly before Mr. Lopez was to be sentenced–well after the conclusion of the trial. In addition, according to Mr. San Pedro Lopez, he overheard Mr. Urena-Bonilla speaking to the unidentified Mexican in the CCA medical treatment waiting room on July 30, 2008; while the jury reached its verdict in Mr. Lopez's case on May 30, 2008. Clearly, defense counsel was in no position to discover the existence of this conversation prior to the conclusion of trial as it took place after the conclusion of the trial.

The second *Higgins* factor–failure to learn of the evidence was not caused by [the defense's] own lack of diligence–is also clearly met. The discussion overheard by Mr. San Pedro Lopez occurred a few months after the jury had found Mr. Lopez guilty. Therefore, no matter the diligence of the defense, there would have been no way to discover the existence of this conversation prior to the trial.

The third and fourth *Higgins* factors–that the evidence be more than merely impeaching and that the evidence be material to the principal issues involved–are also met. If Mr. San Pedro Lopez's testimony regarding the conversation he overheard Mr. Urena-Bonilla having at CCA was true, then it would do more than call into question the

credibility of Mr. Urena-Bonilla as it would corroborate certain aspects of Mr. Lopez's version of events at trial and imply that Mr. Urena-Bonilla and his attorneys had colluded to concoct a story to lessen Mr. Urena-Bonilla's sentence and frame an uninvolved individual. Specifically, Mr. San Pedro Lopez's testimony would support Mr. Lopez's contention that Mr. Urena-Bonilla owed Mr. Lopez $500 for transporting cars and that Mr. Lopez did not know that the cooler contained drugs or that it was put in his truck while he was at the Sonic. Mr. San Pedro Lopez testified at the evidentiary hearing that he had overheard Mr. Urena-Bonilla showing off about how he had tricked the feds and that Mr. Urena-Bonilla's attorney had instructed him on what to say so that he would be believed. It is also clearly material as Mr. Urena-Bonilla's testimony helped put into context what the DEA agents had observed take place at the Best Western Hotel and the Sonic drive-in restaurant in Kansas City, Kansas.

The stumbling block for Mr. Lopez's motion for a new trial is the fifth *Higgins* factor, namely, whether "the new evidence is of such a nature that a new trial would probably produce an acquittal." While Mr. San Pedro Lopez's story does help substantiate some of Mr. Lopez's claims at trial, this court believes it would not probably produce an acquittal in the face of the other evidence the government presented at trial, and consequently, denies Mr. Lopez's motion for a new trial.

First, the sworn affidavits of Mr. Urena-Bonilla's attorneys, which were not challenged by Mr. Lopez, corroborate Mr. Urena-Bonilla's testimony at trial that his attorneys had not discussed the case with him and had not gone over any of the evidence

the DEA had collected. Mr. Urena-Bonilla testified that he did not know the details of his plea agreement with the government and that he had been told by his attorney that the best way to help himself was to cooperate with the government and tell the truth. The sworn affidavits from his attorneys corroborate this testimony as the affidavits explain the attorneys just told Mr. Urena-Bonilla to tell the truth, and the affidavits specifically deny helping Mr. Urena-Bonilla concoct a story for the government to reduce his sentence.

The affidavits also stand in stark contrast to what Mr. San Pedro Lopez testified he heard Mr. Urena-Bonilla bragging about in the medical treatment waiting room at CCA. Mr. San Pedro Lopez–both in his affidavit and while testifying at the evidentiary hearing–stated that Mr. Urena-Bonilla had said he worked with his attorneys to figure out what to say to the government to be believed. However, Mr. Urena-Bonilla's own testimony at trial, at the evidentiary hearing, and perhaps more importantly, the two sworn affidavits by Mr. Urena-Bonilla's attorneys contradict this statement as the attorneys both state they just told Mr. Urena-Bonilla to tell the truth and they did not discuss the underlying facts of the case with Mr. Urena-Bonilla.

Mr. Urena-Bonilla testified at trial about his involvement and the involvement of other members of his family with drug trafficking. It is suggested by the government and the court agrees that Mr. Urena-Bonilla's ultimate willingness to provide information about his family's involvement in drug trafficking enhances Mr. Urena-Bonilla's credibility. He testified and was subject to extensive cross examination about

the methamphetamine found in Mr. Lopez's truck on December 11, 2006. Mr. Urena-Bonilla admitted that he had lied during his first interview with the DEA in February in an attempt to protect his family, especially his brother; however, he subsequently admitted his brother's involvement and the involvement of his wife and sister-in-law with his drug trafficking activities in his second debriefing and at trial.

Most importantly, Mr. Urena-Bonilla's testimony was consistent with other evidence admitted at trial. Namely, his version of what transpired at Sonic was consistent with what the DEA agents observed during their surveillance of the Sonic; while, in contrast, Mr. Lopez's version of what transpired at the Best Western Hotel and Sonic drive-in was not.

For example, Mr. Urena-Bonilla at trial testified that the green truck in which he was the passenger followed Mr. Lopez's red truck into the Sonic and pulled into an adjacent parking stall. This is consistent with what SA Suchma, TFO Stephens, and TFO Morgan observed while conducting surveillance from various nearby vantage points. Mr. Urena-Bonilla further testified that he got out of the green truck with the white Styrofoam cooler and placed it in the back bed of Mr. Lopez's red truck. This statement is consistent with what SA Suchma and TFO Jim Morgan observed during their surveillance. Mr. Urena-Bonilla then testified that as Mr. Lopez began to drive away, Mr. Urena-Bonilla and Mr. Lopez briefly spoke. At this point, Mr. Urena-Bonilla was standing in the driver's side window, and according to Mr. Urena-Bonilla's testimony, Mr. Lopez asked for $500 toward the payment for driving the

methamphetamine. This brief encounter at Mr. Lopez's driver's side window is consistent with what was observed by TFO Morgan while he was conducting surveillance.

In addition, Mr. Urena-Bonilla's testimony that he stopped in Oklahoma to purchase a cooler in which to put the drugs in order to transfer them to the defendant was corroborated by the receipt found in his own truck. Mr. Urena-Bonilla's testimony that he had spoken with Mr. Lopez on several occasions prior to the transfer of drugs in Kansas City was corroborated by the cell phone records of Mr. Lopez and Mr. Urena-Bonilla discussed by SA Suchma during his testimony at trial.

The jury had the opportunity to consider the credibility of the witnesses, and the jury clearly rejected Mr. Lopez's version of events as inconsistent and incredible. Mr. Lopez's own testimony was rejected by the jury as Mr. Lopez's version of events was not corroborated by the rest of the evidence. Specifically, his testimony regarding the events at the Best Western Hotel and Sonic was directly contradicted by the DEA agents' surveillance.

Mr. Lopez first testified at trial that he got out of his truck to meet with Mr. Urena-Bonilla to get the money owed to him. However, none of the DEA agents saw this meeting take place. Each surveillance officer testified that they did not personally observe any contact between Mr. Lopez and any of the individuals riding in the green truck until Mr. Urena-Bonilla leaned into the driver's side window of Mr. Lopez's truck as Mr. Lopez was preparing to exit the Sonic. The only interaction they observed

between Mr. Lopez and Mr. Urena-Bonilla was when Mr. Lopez was pulling out of the Sonic and Mr. Urena-Bonilla approached the truck on the driver's side and had an approximately three minute conversation with him. These observations by the DEA agents do not coincide with Mr. Lopez's version of events; however, as discussed previously, they do coincide with Mr. Urena-Bonilla's version.

Mr. Lopez testified that he got out of his truck and got the money owed to him from Mr. Urena-Bonilla near the passenger's side door of the green truck. However, none of the surveillance officers observed such an exchange as they all described Mr. Urena-Bonilla getting out of the passenger's side of the green truck shortly after it arrived at the Sonic restaurant and placing the cooler in the back of the red truck. SA Suchma was quite clear during his testimony that no one approached or spoke with Mr. Urena-Bonilla as he was putting the cooler into the back of the red truck. In addition, Mr. Lopez's testimony at trial that he exited his truck and received the money owed to him from Mr. Urena-Bonilla contradicts the testimony of Mr. San Pedro Lopez at the evidentiary hearing. Mr. San Pedro Lopez explained at the evidentiary hearing that Mr. Urena-Bonilla picked Mr. Lopez as his "scapegoat" because he owed Mr. Lopez $500–this way Mr. Urena-Bonilla could shift the blame and get rid of the $500 debt without having to pay it. However, Mr. Lopez himself testified at trial that Mr. Urena-Bonilla had in fact paid him the money he was owed at the Sonic. This inconsistency calls into question Mr. San Pedro Lopez's testimony because if Mr. Lopez had been paid at the Sonic, Mr. Urena-Bonilla would not need to place the blame on Mr. Lopez to get

rid of the $500 debt.

In addition, Mr. Lopez testified at trial that no one else got out of the green truck while it was parked at the Sonic drive-in restaurant. However, this testimony directly conflicts with the DEA agents' testimony regarding their surveillance. Specifically, each mentioned observing an individual in an orange-striped shirt and orange ball-cap, later identified as Mr. Nunez, get out of the driver's side of the green truck and come around to the passenger's side of the green truck and look around as though he was conducting counter-surveillance. Therefore, Mr. Lopez's testimony that Mr. Urena-Bonilla was the only individual who got out of the green truck is not corroborated by the surveillance evidence.

Finally, Mr. Lopez testified that once he received his money he re-entered his truck and immediately got out on the highway to go to Emporia. This statement also conflicts with the observations of the DEA agents as TFO Morgan testified that he watched Mr. Lopez and Mr. Urena-Bonilla engage in an approximately three minute conversation while Mr. Urena-Bonilla was on foot and after Mr. Lopez had re-entered his truck and started to pull out of the Sonic. Therefore, all of the evidence presented by the government concerning the DEA agents' surveillance of the scene at the Best Western Hotel and Sonic drive-in restaurant does not coincide with Mr. Lopez's version of events, while the surveillance evidence does appear to corroborate Mr. Urena-Bonilla's version of events.

Additionally, the jury was allowed to consider the prior statements Mr. Lopez

gave law enforcement following his arrest, and his story regarding his purpose for being in Kansas City changed dramatically at trial. In all his prior conversations with law enforcement, Mr. Lopez never mentioned being in the Kansas City area to look at mobile homes and attend car auctions. He originally stated that he was in Kansas City to sign some paperwork regarding land in Texas. In fact, in his first statement to TFO Eberhard and SA Suchma, Mr. Lopez stated that he met Avelino and his uncle–the sellers of the land in Texas–at the Sonic to sign the paperwork. None of the DEA agents who had Mr. Lopez's truck under surveillance saw an interaction as described by Mr. Lopez take place in the Sonic parking lot. At trial, his story regarding the land changed, and while testifying, Mr. Lopez testified that he met Avelino in the parking lot of his hotel before he checked out. In contrast to his initial statement to the DEA agents, Mr. Lopez at trial stated he went to the Sonic to meet up with Mr. Urena-Bonilla to collect a $500 debt. In his initial statement to the DEA agents at Troop A, Mr. Lopez stated that three unidentified laborers wearing jumpsuits were hanging out in the parking lot between the hotel and restaurant. According to Mr. Lopez, one of these men approached him and asked him for money for food and then approached again for a cigarette. While the first man was asking for a cigarette, the other two men also approached and said something that Mr. Lopez did not understand to the first man in English. Directly after this, the first man asked if Mr. Lopez could watch their cooler for a bit. However, this statement is again directly contradicted by the observations of the DEA agents. Not a single DEA agent conducting surveillance observed any individuals hanging around in the parking

lot of the Best Western; nor did any of them observe anyone approach Mr. Lopez's truck on foot while it was parked at the Best Western hotel. They certainly did not observe a cooler being placed in Mr. Lopez's truck at the Best Western–as each testified that the cooler transfer took place in the Sonic drive-in parking lot, not the hotel parking lot. Mr. Lopez told this same general story to TFO Ditter when speaking in Spanish over the phone. In his first interview, Mr. Lopez claimed to have stayed with friends or a girlfriend in Dallas for several days before continuing on to Kansas City. However, at trial, Mr. Lopez testified that he had first gone to Texas to sell a trailer in South Texas–not to stay with friends. At trial, Mr. Lopez claimed that he did not understand the questions he was being asked and denied making these statements to the DEA agents. However, TFO Eberhard and TFO Ditter's testimony was consistent concerning what Mr. Lopez told them on that day. The jury had the opportunity to consider whether to give credence to Mr. Lopez's version of events and they rejected that opportunity as they found him guilty on both counts. Even if the jury found Mr. San Pedro Lopez's demeanor to be credible and that he had no motive to falsify, the addition of this evidence would not overcome the weight of the other evidence admitted at trial and the stark contrasts between Mr. Lopez's story and the surveillance evidence, and consequently, the fifth *Higgins* factor–whether the new evidence is of such a nature that a new trial would probably produce an acquittal–is not satisfied. Therefore, Mr. Lopez's motion for a new trial is denied.

IT IS THEREFORE ORDERED BY THE COURT THAT Mr. Lopez's Motion

for a New Trial (Doc. 114) is denied.

IT IS SO ORDERED.

Dated this 13th day of April, 2009, in Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge